Robert Tauler (SBN 241964)
rtauler@taulersmith.com
J. Evan Shapiro (SBN 218481)
eshapiro@taulersmith.com
TAULER SMITH LLP
626 Wilshire Boulevard, Suite 1100
Los Angeles, California 90017
Tel: (213) 927-9270

*Attorneys for Plaintiff Wendy Blalock*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

WENDY BLALOCK, individually and on behalf of all others similarly situated,

Plaintiff,

v.

FCA US, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,

Defendants.

Case No. 8:26-cv-00201-DMG-KES

**FIRST AMENDED CLASS ACTION COMPLAINT FOR: (1) VIOLATION OF THE CALIFORNIA TRAP AND TRACE LAW (CAL. PENAL CODE § 638.51); (2) INTRUSION UPON SECLUSION**

**ACTION SEEKING STATEWIDE OR NATIONWIDE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiff Wendy Blalock ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows based on personal knowledge as to her own conduct and on information and belief as to all other matters:

## INTRODUCTION

1. This case is about digital surveillance embedded in a consumer website. When Californians visit Defendant FCA US, LLC's ("Defendant") website, they reasonably expect a straightforward interaction: their browser requests a page, and the website returns it. Defendant added something else to this exchange: a tracking code that causes visitors' browsers to capture and export visitor-identifying information to a third-party data broker so the visit can be tied to an identity profile and used for cross-site tracking, targeting, and monetization. This process benefits both Defendant and the data broker commercially and financially.

2. Defendant owns and operates https://www.chrysler.com (the "Website"), which Defendant uses to market vehicles and related services to consumers in California and throughout the United States.

3. On the Website, Defendant embedded LiveRamp tracking software (the "Tracking Beacon"). The Tracking Beacon is a device or process that runs when a webpage loads and transmits hundreds of data points about a visitor to the Website and her device and browser to LiveRamp for identity matching and monetization.

4. The Tracking Beacon initiates a process whereby the visitor data collected during a visit to the Website is correlated with extensive external records LiveRamp already has about most Californians in order to learn the identity of those visitors.

5. Both Defendant and the data broker behind the software deployed by the Website benefit commercially and financially from this activity. That is because collected and transmitted visitor data, as well as the identification of specific visitors using that data, are performed with the purpose of targeting Website visitors for specific marketing, among other things.

6. Defendant's installation and use of data broker software without obtaining

consent or authorization therefore violated California Penal Code § 638.51, California's Trap and Trace Law and duties Defendant owed to Plaintiff and other visitors to the Website similarly situated under applicable common law.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the proposed Class consists of 100 or more members, the amount in controversy exceeds $5,000,000, exclusive of costs and interest, and minimal diversity exists.

8. This Court has personal jurisdiction over Defendant because Defendant purposefully directed its conduct toward California by operating an interactive commercial Website to solicit and serve California consumers and by deriving substantial commercial benefit from California-based Website interactions.

9. The Website contains a substantial amount of California-related content aimed at attracting California consumers to visit the Website and purchase Defendant's vehicles from dealerships located in California. For example, the Website includes a "Find A Dealer" function which allows visitors to the Website from California to locate dealerships near their California zip codes. The Website also allows visitors to search Defendant's inventory using their California zip codes and search for incentives and offers for Defendant's vehicles based on the zip codes.

10. Defendant maintains at least 100 dealerships in California to sell and deliver to California consumers vehicles marketed on the Website.

11. Defendant's privacy policy displayed on a webpage on the Website includes a separate section directed at "California residents" explaining and purporting to show compliance with California privacy law. The privacy policy does not address the residents of any other state

12. Further, Defendant installed and used the Tracking Beacon on the Website to identify, profile, track on the internet and monetize the activity of California residents, including Plaintiff. When Plaintiff accessed the Website from California,

Defendant's tracking technologies collected routing information sufficient to recognize Plaintiff as a California user and then captured and transmitted Plaintiff's visitor-identifying dialing, routing, addressing, and signaling information to LiveRamp. LiveRamp maintains its headquarters in San Francisco, California. Plaintiff's claims arise out of and relate to Defendant's forum-directed conduct, and the exercise of jurisdiction comports with due process and traditional notions of fair play and substantial justice.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Plaintiff's access to and use of the Website from this District and Defendant's collection, use, and transmission of Plaintiff's data in connection with that activity. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## PARTIES

14. Plaintiff Wendy Blalock is an individual, citizen, and resident of California.

15. Defendant FCA US, LLC is a limited liability company formed under the laws of Delaware and maintains its principal place of business at 1000 Chrysler Drive, Auburn Hills, Michigan 48326.

16. Plaintiff alleges the fictitiously named defendants captioned hereinabove as Does 1 through 10, inclusive, and each of them, were in some manner responsible or legally liable for the actions, damages, events, transactions, and circumstances alleged herein. The true names and capacities of such fictitiously named defendants, whether individual, corporate, associate, or otherwise are presently unknown to Plaintiff, and Plaintiff will amend this Complaint to assert the true names and capacities of such fictitiously named defendants when they have been ascertained. For

convenience, each reference herein to the named Defendant shall also refer to the Doe defendants.

## FACTUAL ALLEGATIONS

### *A. The Tracking Beacon Extracts and Transmits Visitor-Identifying Signals.*

17. Defendant owns, operates, and markets its products on, the Website.

18. The Website, like most other websites, due to code or software programs running on the Website, determines the state and sometimes the city in which its visitors are located – between the time a visitor requests to go to the Website (through clicking on a link or typing the Website's address into the browser address bar), and the time the Website loads on her screen. This location gathering occurs separately and apart from the Tracking Beacon running on the Website that forms the basis of Plaintiff's claims in this action. Therefore, Defendant has at the very least constructive knowledge that the data broker code on the Website that is the subject of this action operated on Plaintiff, and visitors to the Website from California similarly situated, while they were located in California. Defendant had such knowledge during the time the violations of statutes and common alleged herein were occurring.

19. The Website is highly interactive and facilitates decision-making by consumers located in California about prospective and substantial financial transactions. It allows consumers to research specific vehicle models and trims, pricing, incentives, leasing or financing options, dealer selection, and related services. A visitor's navigation of the pages of the Website can reveal private facts about her finances, purchasing intent, geographic location, as well as the needs of her household.

### *B. Browser Fingerprinting*

20. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings are transmitted to LiveRamp? One would think that the sharing of such seemingly non-personal data cannot impact a visitor's life or experience. This would be an erroneous assumption.

21. The fact is that when you visit a website, typically before you get to weigh in on whether you should be targeted with ads or identified, hundreds of non-personal data points tell those data brokers and social media companies who you are, or at the very least stop this relatively brief process. (These data points are usually accompanied by information such as the webpage you were viewing immediately prior to arriving at the website, and your city and state.) Data brokers may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

22. Examples of such data points are:

- Device type and configuration
- Browser type and version
- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

23. To be clear, website operators require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will only load appear properly to a visitor with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being transmitted to a third party not involved in operation of the website visited, or the rendering of the website's contents on the screens of visitors. Data brokers do not need the data to operate any website, or for any purpose other than to identify, target and track website

visitors.

24. As explained in an article in the October 2025 issue of Wired Magazine:

> Your browser fingerprint is a collection of innocuous information about your PC that, when put together, is unique enough that it could identify an individual. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC, your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

25. The fingerprinting process works even when a visitor does not enter any items colloquially referred to as "personal data" – such as name, telephone number, address or email address – into a website.

26. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising. Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You: Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 2/22/2026).

27. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, People of the State of California v. Sephora USA, Inc., CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "Sephora Complaint"), at 2:2-13 (emphasis added).

### *C. California's Trap and Trace Law Applies to Code and Websites*

28. California Penal Code § 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not

the contents of a communication."

29. California Penal Code § 638.51(a) provides (in relevant part) that, except as provided in subdivision (b), "a person may not install or use [ ] a trap and trace device without first obtaining a court order" pursuant to specified provisions.

30. California's Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., was enacted in 1967. The first statute in the act, § 630, explains:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society. The Legislature by this chapter intends to protect the right of privacy of the people of this state.

31. In 1986, Congress enacted the Electronic Communications Privacy Act, which includes a prohibition on the use of a trap and trace device "without first obtaining a court order under section 3123 of this title, of under the Foreign Intelligence Surveillance Act of 1978…". Pub. L. 99–508, title III, § 301(a), 100 Stat. 1868 (Oct. 21, 1986). At the opening of a September 26, 1985 hearing of the U.S. House of Representatives Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the Committee on the Judiciary, on the Electronic Communications Privacy Act, the Chairman of the Subcommittee, Representative Robert W. Kastenmeier explained (emphasis added):

> This morning we begin a series of hearings on H.R. 3378, the Electronic Communications Privacy Act of 1985. [ . . . ] When Congress passed the wiretap law in 1968, there was a clear consensus that telephone calls should be private. Earlier

> Congresses had reached that same consensus regarding mail and telegrams. But in the almost 20 years since Congress last addressed the issue of privacy of communications in a comprehensive fashion, the technologies of communication and interception have changed dramatically. Today we have large-scale electronic mail operations, cellular and cordless telephones, paging devices, miniaturized transmitters for radio surveillance, lightweight compact television cameras for video surveillance, and ***a dazzling array of digitized information networks*** which were little more than concepts two decades ago. These new modes of communication have outstripped the legal protection provided under statutory definitions bound by old technologies. The unfortunate result is that the same technologies that hold such promise for the future also enhance the risk that our communications will be intercepted by either private parties or the Government. Virtually every day the press reports on the unauthorized interception of electronic communications ranging from electronic mail and cellular telephones ***to data transmissions between computers***.
>
> Congress needs to act to ensure that the new technological equivalents of telephone calls, telegrams, and mail are afforded the same protection provided to conventional communications. It is my hope that in the weeks and months ahead the affected parties will work with the subcommittee in the spirit of cooperation and compromise to forge a bill which meets this urgent problem.

32. In 2001, Congress, determining that the currently-existing definitions of

pen registers and trap and trace were antiquated, modified them in the USA Patriot Act of 2001 so as to expressly include electronic communications beyond telephonic communications within their ambit. See Pub. L. No. 107-56, § 216, 115 Stat. 272 (2001). The legislative history of the Patriot Act establishes that the modifications were made to "ensure[ ] that the pen register and trap and trace provisions apply to facilities other than telephonic lines." 147 Cong. Rec. SI0990-02, SI 1006, 2001 WL 1297566 (Oct. 25, 2001), also available at https://www.congress.gov/107/crec/2001/10/25/147/144/CREC-2001-10-25-pt1-PgS10990-2.pdf (last viewed 4/9/2026). During the floor discussion of the Patriot Act in the Senate on October 25, 2001, Chairman of the Senate Judiciary Committee, Senator Patrick Leahy, discussing the then-existing definitions of pen registers and trap and trace devices stated:

> Moreover, the statute is ill-equipped to facilitate the tracing of communications that take place over the Internet. For example, the pen register definition refers to telephone "numbers" rather than the broader concept of a user's communications account.

*Id.*, at S11000.

33. Through the Patriot Act Congress amended the federal definition of trap and trace set forth in 18 U.S. Code § 3127(4) to insert the following words: "or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;" Pub. Law 107-56, 115 STAT 290 (2001).

34. Nearly a decade after Congress revised the federal definition of pen registers and trap and trace devices for the express purpose of ensuring they applied to internet technologies, California's Trap and Trace law, codified at Cal. Penal Code §§ 638.50-51, was enacted as AB 929 on August 13, 2015.

35. The definition of a "trap and trace device" set forth in § 638.50(c) derives mostly from the definition of "trap and trace device" used in applying federal privacy statutes, set forth in 18 U.S. Code § 3127(4), as amended in 2001. The federal definition reads: "the term "trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing, addressing, and signaling information reasonably likely to identify the source of a wire or electronic communication, provided, however, that such information shall not include the contents of any communication;".

36. The legislative history of AB 929 demonstrates that the California Legislature knew the federal definitions of pen register and trap and trace device when it adopted them nearly verbatim into California law in 2015.

37. Thus the language "dialing, routing, addressing, and signaling information" found in Cal. Penal Code § 638.50(c) can only be understood as applying to electronic communications technology that existed in 2001 – and not limited to telephones. Thus, a majority of California courts, both state and federal, have found that software or code running on websites that "captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication" constitutes a trap and trace device under §§ 638.50-51. *See, e.g., Nelson v. Reddit, Inc.*, 2026 U.S. Dist. LEXIS 32134, at *7-10 (S.D. Cal. Feb. 17, 2026); *Alex & Ani, LLC*, 2026 U.S. Dist. LEXIS 11238, at *4-7 (C.D. Cal. Jan. 20, 2026); *Casillas v. Six Flags Ent. Corp.*, 2025 U.S. Dist. LEXIS 260100, at *21-22 (C.D. Cal. Dec. 15, 2025); *Lewis v. Magnite, Inc.*, 2025 U.S. Dist. LEXIS 263675, at *39-42 (C.D. Cal. Dec. 4, 2025); *Camplisson v. Adidas Am., Inc.*, 809 F.Supp.3d 1095, 1107 (S.D. Cal. Nov. 18, 2025); *Santoro v. Lulu*, 2025 Cal. Super. LEXIS 84529 (L.A. Super. Ct. Nov. 11, 2025); *Garon v. Keleops USA, Inc.*, 2025 U.S. Dist. LEXIS 170745, at *10-15 (N.D. Cal. Sep. 2, 2025); *Valenzuela v. Intersystems Corp.*, 2025 Cal. Super. LEXIS 42550, at *3-4 (Orange Co. Superior Ct. Aug. 4, 2025); *Riganian v. LiveRamp*

*Holdings, Inc.*, 791 F.Supp.3d 1075, 1093-1094 (N.D. Cal. July 18, 2025); *Gabrielli v. Motorola Mobility LLC*, 2025 U.S. Dist. LEXIS 133836, at *30-32 (N.D. Cal. July 14, 2025); *Price v. Headspace, Inc.*, 2025 Cal. Super. LEXIS 27951, at *3-9 (L.A. Super Ct. Apr. 1, 2025); *Sanchez v. Glasscanopy, Inc.*, 2025 Cal. Super. LEXIS 18460, at *8-9 (L.A. Super. Ct. Feb. 28, 2025); *Heiting v. Fka Distrib. Co.*, 2025 U.S. Dist. LEXIS 20076, at *8 (C.D. Cal. Feb. 3, 2025); *Conohan v. Rad* Power *Bikes Inc.*, 2025 U.S. Dist. LEXIS 72865, 2025 WL 1111246, at *16 (C.D. Cal. Apr. 3, 2025); *Rodriguez v. Autotrader.com, Inc.*, 762 F.Supp.3d 921, 929-930 (C.D. Cal. 2025); *Lesh v. Cable News Network, Inc.*, 767 F.Supp.3d 33, 40-42 (S.D.N.Y. 2025); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 U.S. Dist. LEXIS 227378, at *6-10 (N.D. Cal. Dec. 12, 2024); *Carreiro v. Ehm Productions, Inc.*, 2024 Cal. Super. LEXIS 60888, at *5-6 (L.A. Super. Ct. Dec. 11, 2024); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 930-931 (N.D. Cal. October 21, 2024); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076-1077 (C.D. Cal. July 25, 2024); *Greenley v. Kochava, Inc.* 684 F.Supp.3d 1024, 1050 (S.D. Cal. 2023).

### *D. The Tracking Beacon is a "Trap and Trace Device" per Sec. 638.50(c).*

38. The Tracking Beacon transmits information to LiveRamp such as: (i) the specific page and resource addresses the visitor requests from the Website (including paths and parameters identifying the content being requested); (ii) referrer and source fields showing how the visitor arrived at the Website and the prior page or channel that directed the request; (iii) browser- and device-signaling fields that describe the visitor's client environment (e.g., browser family and version, operating system family and version, language/locale settings, time zone, screen and rendering characteristics, and related client "fingerprint-like" attributes); and (iv) unique request and session identifiers and timestamps generated during the visit that allow multiple page requests to be grouped and attributed to the same source.

39. The additional visitor-identifying signals transmitted to LiveRamp by the Tracking Beacon include the addressing and routing data embedded in a visitor's web

requests and the Website's responses; data that functions as the communication's "to/from" and routing instructions that can be used to recognize and link a visitor's communications over time.

40. When those visitor-level signals are linked to an identity profile, they become attributable to a specific individual rather than an anonymous browser session.

41. The Tracking Beacon on the Website plays no role in delivering website content to Website's visitors devices. That is all handled by Defendant, which also receives data about the devices and browsers. By contrast, the data delivered to LiveRamp via the Tracking Beacon is used solely to enable third-party identity matching and monetization. This is accomplished through what is referred to as "browser fingerprinting."

42. LiveRamp is a California data broker that specializes in deanonymizing website visitors by matching visit-level signals to a broader identity database and assigning or retrieving a persistent identifier associated with the visitor.

43. The Tracking Beacon tracks online signals from a website visit and matches it with Live Ramp's vast database to create a serial number for an individual called a "RampID" that is the same across websites the individual visits. First, it sends the identifying visitor data it has collected to LiveRamp's servers, where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline. LiveRamp's pre-existing data may include a visitor's name and postal address, email address, cookie IDs, and mobile device IDs. LiveRamp's RampID is permanent, and designed to persistently track an individual across thousands of websites. RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user, and see the user's online habits.

44. Identification of website visitors through the Tracking Beacon happens in "real-time," allowing the websites of LiveRamp's customers to "access people-based

data immediately at the time of impression." It also works across devices; in other words, the Tracking Beacon can inform websites using it that the same account or person has accessed the website from different devices. As LiveRamp explains, "[w]ith impressions matched to a persistent people-based ID, data are stitched across devices and not lost over time with new cookies or phones."

45. Through this process, initiated by the Tracking Beacon, enables LiveRamp to build or enhance its profiles on visitors to the Website, including Plaintiff and members of the putative Class in this action, and to track their future internet browsing in ways that would be highly offensive to a reasonable person.

46. During Plaintiff's visit to the Website on August 24, 2025, Defendant caused the Tracking Beacon to run on Plaintiff's device and to capture and transmit Plaintiff's visitor-identifying dialing, routing, addressing, and signaling information to LiveRamp in real time. On information and belief, LiveRamp added Plaintiff's data to its profile(s) of Plaintiff, or used the data to create a new profile of Plaintiff; in turn, this enabled ongoing tracking of Plaintiff's browsing onto different websites.

47. Plaintiff did not provide express, informed consent to this capture and transmission. Defendant did not obtain a court order authorizing it.

***E. The Commercial Exploitation of Visitors' Profiles***

48. Once LiveRamp links the data of a visitor to the Website to a pre-existing profile, the visit can be used to enrich that profile and to support targeting far beyond the context of the Website visit. If no such profile existed, LiveRamp can create one and use that as a starting point for ongoing browsing tracking and enhancement.

49. Data brokers openly market the ability to convert ordinary web activity into intimate, individualized profiles. Indeed, the CEO of the world's largest data broker recently bragged about the staggering extent to which data brokers secretly track internet users:

> [W]e know who she is, what she watches, what she reads, and who she lives with . . . Through the power of connected identity, we also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. . . . We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation.[2]

50. On information and belief, LiveRamp used Plaintiff's visitor-identifying signals to associate Plaintiff's Website visit with a LiveRamp profile and to enrich that profile with information about Plaintiff's interaction with the Website; the same can be said about the data of members of the putative Class in this action. On information and belief, in addition to LiveRamp, Defendant obtains commercial value from this arrangement, including by enabling more precise audience building and targeted solicitation.

***F. Data and Related Profiles of Consumers Have Economic Value That Use of the Tracking Beacon Diminishes.***

51. The visitor data that the Tracking Beacon on the Website transfer LiveRamp have economic value – as it obvious from the facts that data brokers like LiveRamp have created trap and trace devices to collect it, and that Defendant installed the Tracking Beacon on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Tracking Code on the Website.

---

[2] Lucas Ropek, *Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users*, March 15, 2025 (gizmodo.com).

52. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website, including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[3]

53. As recently explained by the Law Institute:[4]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable

---

[3] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 2/23/2026).

[4] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 2/23/2026).

> devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

54. There exists an established market for the type of personal data collected and transmitted through the Tracking Beacon on the Website: data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the Tracking Beacon diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

### *G. Troubling Implications of Transfer of Visitor Data to Data Brokers*

55. Once visitor-identifying data are linked to a broker-maintained identity profile, the data becomes portable: it can be sold, licensed, queried, or otherwise disclosed to a wide range of third parties and repurposed outside the context of the web site visit or visits that generated it.

56. According to the Brennan Center for Justice:

> Among the main purveyors in this surveillance capitalism ecosystem are data brokers—companies that collect, assemble, and analyze personal information to create detailed profiles of individuals, which they then sell. . . . Myriad entities buy this information. For example, financial institutions and insurance firms use data for identity verification and risk assessments. Advertising companies use data to offer more relevant and targeted advertisements. More troublingly, data brokers have sold personal information to predatory loan companies, stalkers, and scammers, as well as to political consultants . . . that can use data to send voters disinformation and attempt to skew electoral outcomes. Data brokers also sell data to foreign actors whose uses of the information are not constrained by U.S. law. And . . . law enforcement and other government agencies (including state and local law enforcement, the FBI, the IRS, the Drug Enforcement Administration, the Department of Defense, and the Department of Homeland Security) have secretly been paying data brokers to access vast databases of personal information, including

geolocation data, without any warrant, court order, or even subpoena.[5]

57. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") based on an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney advocating on behalf of a refugee from Afghanistan in deportation proceedings.[6] No clear legal authority exists preventing the sale or dissemination of user data by data brokers to the federal government.

58. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[7]

59. In early March 2026, a news website reported about the existence of an U.S. Department of Homeland Security internal document revealing that Custom and Border Protection "bought data from the online advertising ecosystem to track peoples' precise movements over time . . ."[8]

---

[5] Emile Ayoub and Elizabeth Goitein, *Closing the Data Broker Loophole*, February 13, 2024 (brennancenter.org).

[6] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 2/8/2026).

[7] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 2/25/2026).

[8] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited

### *H. Injuries Caused by Defendant's Use of the Tracking Beacon on the Website*

60. Defendant's installation and use of the Tracking Beacon on the Website has caused, and continues to cause, injury to Plaintiff, and other similarly situated visitors, in concrete ways: Plaintiff's communications with the Website were converted into a linkable identity record without Plaintiff's consent; Plaintiff lost control over how the extracted visitor-identifying signals are used and disseminated; and Plaintiff faces an ongoing risk that this unlawfully created identity linkage will be repurposed, shared, or sold within the data-broker ecosystem for uses far removed from Plaintiff's purpose in visiting the Website.

61. Defendant's deployment of the Tracking Beacon intentionally interfered with Plaintiff's private affairs – and those of members of the putative Class – in a manner a reasonable person would find highly offensive. It transformed what Plaintiff and the members believed was an anonymous visit to the Website to the disclosure of their identity and the initiation of ongoing internet tracking, enabling LiveRamp and other third parties to inundate them with unwanted targeted marketing and possible sale of their data.

62. The disclosure to LiveRamp itself, made without consent and for the purposes of identity matching and monetization, constitutes an invasion of privacy because it attributes personal browsing activity to a visitor's identity profile and exports it outside the consumer-website relationship.

////

////

---

3/16/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 3/16/20260.

## CLASS ACTION ALLEGATIONS

63. **Class Definition**. Plaintiff brings this action as a class action on behalf of herself and all others similarly situated as members of the "Class" defined as follows:

> **All persons in California whose visitor-identifying dialing, routing, addressing, or signaling information was captured and transmitted as a result of visiting the Website during the applicable limitations period.**

64. Excluded from the Class are: (i) Defendant and its parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; (ii) Defendant's officers and directors; (iii) the Court, the Court's staff, and any judicial officer assigned to this case and members of their immediate families; and (iv) any person who timely and validly opts out of the Class.

65. Plaintiff reserves the right to amend the Class definition as discovery and the Court's rulings warrant.

66. **Rule 23 Reference.** Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

67. **Numerosity.** The Class is so numerous that joinder is impracticable. The Website is a widely used consumer website. The Tracking Beacon operated automatically during Website visits and applied in the same manner to California visitors. Class members are therefore readily in the thousands, if not more, and can be identified through objective criteria, including Website visit records and data transfers to LiveRamp.

68. **Commonality.** Common questions of law and fact exist, including:

a. Whether Defendant deployed the Tracking Beacon on its Website;

b. Whether the Tracking Beacon captured and transmitted visitor-identifying dialing, routing, addressing, and signaling information from Californians visiting the Website;

c. Whether Defendant installed or used a "trap and trace device" or "device or process" within the meaning of Penal Code § 638.50(c);

d. Whether Defendant obtained consent and/or a court order required by Penal Code § 638.51;

e. Whether and to what extent statutory damages and injunctive relief are available under Penal Code § 637.2; and

f. The proper measure of statutory damages and the scope of injunctive relief.

69. **Predominance.** Common issues predominate. Defendant's deployment of the Tracking Beacon was uniform, and the key issues are capable of resolution using common proof, including Defendant's Website implementation, technical logs, vendor documentation, and LiveRamp records. Individualized inquiries are not necessary to determine liability because the challenged conduct is the same for all Class members.

70. **Typicality.** Plaintiff's claims are typical of the Class because Plaintiff, like every Class member, visited the Website from California and was subjected to the same uniform practice: the Tracking Beacon's capture and transmission of visitor-identifying dialing, routing, addressing, and signaling information.

71. **Superiority.** A class action is superior to other methods of adjudication. The statutory damages available for each Class member are not likely to support individual litigation, and resolving these claims in a single proceeding will conserve judicial resources, avoid inconsistent outcomes, and provide an efficient mechanism for relief.

72. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests align with those of the Class, and Plaintiff has retained counsel with substantial experience litigating privacy and complex class actions. Plaintiff has no interests antagonistic to the Class.

73. **Injunctive Relief.** Defendant has acted on grounds generally applicable to the Class by deploying the Tracking Beacon in a uniform manner on the Website. Plaintiff therefore seeks final injunctive and declaratory relief appropriate to the Class as a whole, including an order prohibiting Defendant from capturing and transmitting

visitor-identifying dialing, routing, addressing, and signaling information via the Tracking Beacon without the consent and/or court order required by California law.

74. **Notice.** Plaintiff will propose and submit to the Court a plan for providing the best notice practicable under the circumstances to Class members, including individual notice to the extent Class members can be identified through reasonable effort, and will request that such notice be provided consistent with Fed. R. Civ. P. 23 and due process.

**COUNT I: VIOLATIONS OF THE CALIFORNIA TRAP AND TRACE LAW, CAL. PENAL CODE § 638.51**

**(*On Behalf of Plaintiff and the Class*)**

75. Plaintiff and Class members incorporate by reference all preceding paragraphs as though fully set forth herein.

76. CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

77. CIPA prohibits any person from installing or using a trap and trace device without first obtaining consent or a court order. Cal. Penal Code § 638.51(a).

78. Defendant installed and used the Tracking Beacon on the Website. The Tracking Beacon is a "device or process" within the meaning of § 638.50(c) because it operates during Website visits to capture incoming electronic impulses and transfers visitor-identifying dialing, routing, addressing, and signaling information.

79. As alleged herein, the Tracking Beacon captures and transmits, among other things, addressing and routing information, referrer and source fields, browser- and device-signaling fields, and unique request and session identifiers and timestamps—information reasonably likely to identify the source of electronic communications.

80. The "electronic communication[s]" at issue in this case are the communications between the devices of Plaintiff and the Class members, on the one hand, and the Website, an instrumentality of Defendant, on the other hand. "Electronic communication" is defined under CIPA as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system." A visit to a website entails the transfer of signals and data, or "intelligence of any nature" by a "wire, radio [or] electromagnetic [ . . . ] system." Cal. Penal Code § 629.51(a)(2). The interactions of Plaintiff and Class members with the Website meet this definition.

81. The "sources" of the electronic communications moving from the devices to the Website are Plaintiff and the Class members (including their devices).

82. Defendant installed and used the Tracking Beacon without first obtaining a court order authorizing the installation or use of a trap and trace device or process.

83. On August 24, 2025, Plaintiff visited the Website from California. During Plaintiff's visit, Defendant caused the Tracking Beacon to run on Plaintiff's device and to capture and transmit Plaintiff's visitor-identifying dialing, routing, addressing, and signaling information to LiveRamp in real time.

84. On information and belief, Defendant deployed the Tracking Beacon in the same manner for other California visitors to the Website during the Class period, causing the same capture and transmission of visitor-identifying dialing, routing, addressing, and signaling information to LiveRamp.

85. Plaintiff did not provide express, informed consent to Defendant's installation or use of the Tracking Beacon. On information and belief, Defendant likewise did not obtain express, informed consent from Class members.

86. By installing and using the Tracking Beacon on the Website without the consent and/or court order required by CIPA, Defendant violated Penal Code § 638.51.

87. Defendant is ineligible for the statutory consent exemption from liability for use of a trap and trace device set forth in Cal. Penal Code § 638.51(b)(5). The §

638.51(b)(5) consent exemption is available only to a "provider of electronic or wire communication service." Defendant is not such a provider.

88. Plaintiff and Class members suffered injury as a result of Defendant's violation(s) of § 638.51. Defendant's installation and use of the Tracking Beacon on the Website resulted in the transmission and possible sale of the personal information of Plaintiff and Class members to LiveRamp (transmission), and possibly other third parties. This process diminished the value of such information. Moreover, it injured the rights of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties.

89. Pursuant to Penal Code § 637.2, Plaintiff and the Class seek statutory damages, injunctive relief, and such other relief as the Court deems proper.

**COUNT II: COMMON LAW INTRUSION UPON SECLUSION**

**(*On Behalf of Plaintiff and the Class*)**

90. Plaintiff and Class members incorporate by reference all preceding paragraphs as though fully set forth herein.

91. Under California law, a defendant is liable for intrusion upon seclusion when it intentionally intrudes into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person.

92. Plaintiff and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that many of our necessary daily activities be conducted online. Plaintiff and Class members are unable to conduct their lives without engaging in substantial activity on the internet. This fact means that Plaintiff's and Class members' private lives are susceptible to observation and recording that can be used in ways that are comprehensive and highly intrusive - including the creation of profiles capturing their attributes, habits and behavioral patterns. If Plaintiff and Class

Members cannot maintain a reasonable expectation of privacy in the conducting of their daily affairs online, and in the digital transmission of their personal information, they can have no such expectation for other facets of their lives.

93. Defendant's deployment of the Tracking Beacon on the Website intentionally intruded into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website. The intrusion allowed Tracking Beacon to identify, profile and track (on an ongoing basis) Plaintiff and Class members. Use of the Tracking Beacon violates Plaintiff's and Class members' reasonable expectation of privacy, intercepting, collecting, tracking, and compiling their internet browsing and communications, and making that data available for sale.

94. Plaintiff and the Class members never authorized the third-party cookies and other tracking technology initiated by the Tracking Beacon on the Website.

95. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

96. Defendant's intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, it was perpetrated for Defendant's economic benefit.

97. The intrusion described herein would be highly offensive to a reasonable person and constitutes an egregious breach of social norms. Data brokers like LiveRamp engage in a dragnet-style collection and interception of individuals' online activities. They are in the business of creating comprehensive "cradle to grave" profiles on individuals that incorporates both an individual's online activities and offline information. The electronic information gathered by data brokers like LiveRamp reflects highly personal aspects of individuals' lives, and can be used for purposes as political or healthcare advertising – thereby intruding on aspects of individuals' lives that are considered highly personal and confidential. Moreover,

Defendant and LiveRamp have violated California statutes designed to protect the privacy rights of California citizens.

98. Defendant's invasion of the privacy of Plaintiff and Class members damaged them and they are there entitled to compensatory damages, which includes monetary damages.

99. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in her favor and against Defendant, and award the following relief:

1. Certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative, and appoint Plaintiff's counsel as Class Counsel;

2. Declare that Defendant's conduct as alleged herein violates California Penal Code § 638.51;

3. Award statutory damages to Plaintiff and the Class pursuant to California Penal Code § 637.2;

4. Issue an order requiring Defendant to delete and cease retaining any visitor-identifying dialing, routing, addressing, and signaling information captured or received through the Tracking Beacon, and to take commercially reasonable steps to direct its service providers (including LiveRamp) to do the same to the extent Defendant has the right or ability to do so;

5. Award injunctive relief requiring Defendant to cease installing and/or using the Tracking Beacon or any trap and trace device or process on the Website without the consent and/or court order required by California Penal Code § 638.51,

and requiring such further injunctive relief as the Court deems just and proper;

6. Award compensatory damages or nominal damages for Defendant's intrusion upon seclusion;

7. Issue an order requiring Defendant to disgorge revenues and profits it wrongfully obtained through its intrusion upon seclusion as to Plaintiff and the Class;

8. Award Plaintiff and the Class their reasonable attorneys' fees and costs to the extent permitted by law;

9. Award pre-judgment and post-judgment interest as permitted by law; and

10. Grant such other and further relief as the Court deems just and proper.

DATED: April 15, 2026

TAULER SMITH LLP

*/s/ J. Evan Shapiro*
J. Evan Shapiro

*Attorneys for Plaintiff Wendy Blalock*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all issues triable to a jury.

DATED: April 15, 2026

TAULER SMITH LLP

*/s/ J. Evan Shapiro*
J. Evan Shapiro

*Attorneys for Plaintiff Wendy Blalock*